**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| C.F., By His Parents, W.F. and L.F., | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| v. | : | |
| | : | **NO. 17-4765** |
| **RADNOR TOWNSHIP SCHOOL** | : | |
| **DISTRICT,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM

**Tucker, J.**                                                  **March 14, 2019**

Before the Court are Plaintiff's Motion for Judgment on the Administrative Record ("Plaintiffs' Motion") (ECF No. 13), the Motion for Judgment on the Administrative Record by Defendant Radnor Township School District ("Defendant's Motion") (ECF No. 15), the underlying Sealed Administrative Record (ECF No. 10), Plaintiff's Cross-Response in Opposition to Defendant's Motion for Judgment on the Administrative Record (ECF No. 17), and Defendant Radnor Township School District's Response to Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 20). Upon consideration of the foregoing, and as explained in detail below, Plaintiff's Motion is DENIED and Defendant's Motion is GRANTED.

## I.    PROCEDURAL HISTORY

Plaintiff is a student diagnosed with Asperger's Disorder, Attention Deficit Hyperactivity Disorder, and classified under the Individuals with Disabilities Education Act ("IDEA") as a student with autism and speech/language impairment. After Plaintiff's parents ("Parents") unilaterally enrolled Plaintiff in a private school, Parents demanded that Defendant Radnor Township School District reimburse them for the costs of Plaintiff's private school tuition. Parents enrolled Plaintiff in a private school because they rejected the Individualized Education

1

Plan ("IEP") that Defendant designed for Plaintiff with the input of Plaintiff, Parents, and Plaintiff's private education and medical experts.

Defendant refused to reimburse Plaintiff's private school tuition because it believed that the IEP it offered met the requirements of the IDEA and Radnor Middle/High School was an appropriate placement for Plaintiff. The Parties proceeded to an administrative due process hearing to resolve their dispute. After a three-day hearing involving live testimony and the admission of a number of exhibits, the hearing officer concluded that the IEP complied with the requirements of the IDEA and, therefore, Plaintiff and Parents were not entitled to reimbursement for Plaintiff's private tuition.

After receiving this adverse decision, Plaintiff and Parents filed suit in this Court arguing that the hearing officer erred in rendering her decision. The Parties have submitted cross motions for judgment on the administrative record, which are now ripe for decision.

## II.     FACTUAL BACKGROUND

### A.     Plaintiff C.F.'s Early Childhood and Education

Early in life, Plaintiff was slow to meet certain physical and developmental milestones. Hearing Officer Decision ("HOD") 3 ¶ 2, ECF No. 10.[1] Among other things, Plaintiff received therapy for generalized hypotonia (relating to low muscle tone), hip dysplasia (relating to the fit of the ball and socket joint of the hip), distal arthrogryposis (relating to bone joint deformities), and vertical talus (relating to a foot muscle disorder). HOD 3 ¶ 3. In addition to physical therapy, Plaintiff also received early intervention speech services and private speech/language therapy. HOD 3 ¶¶ 2, 5.

---

[1] All citations to the Sealed Administrative Record are to the documents contained at ECF No. 10. The Court received a supplement to the Sealed Administrative Record identified as "Exhibit A" at ECF No. 22.

From age two to six, Plaintiff attended a private pre-Kindergarten school. HOD 3 ¶ 6. At Parents' direction, Plaintiff stayed in pre-Kindergarten for an extra year and, consequently, was one year older than most students when he began Kindergarten at a public elementary school. HOD 3 ¶ 6. Before the start of Plaintiff's Kindergarten year, Parents asked Defendant to evaluate Plaintiff to determine whether he was eligible for special education support. HOD 3 ¶ 7. Defendant determined that Plaintiff was eligible for special education support and, thus, Defendant designed a Kindergarten education plan with various special education services. HOD 3 ¶ 7. Plaintiff spent a full Kindergarten year at a Radnor Township School District school. HOD 3 ¶ 7.

After one year in Kindergarten, however, Parents removed Plaintiff from public school and enrolled Plaintiff in a private parochial school. HOD 3 ¶ 7. Plaintiff remained in parochial school from first through eighth grade. For the duration of Plaintiff's time in parochial school, Plaintiff did not receive any special education programming. HOD 3 ¶ 8.

**B.      Parents Hire Private Psychologist and Private Speech/Language Pathologist to Evaluate Plaintiff**

In the Fall of 2015, Parents retained a private psychologist to evaluate Plaintiff "to help [Plaintiff] transition to an independent high school." *See generally* P-15 (Dr. Anderer's Confidential Report of Psychoeducational Evaluation); *see also* HOD 6 ¶ 33 (finding Parents had Plaintiff "privately evaluated in the fall of [Plaintiff's] 8th grade"). Plaintiff's private psychologist, Dr. Susan E. Anderer, worked to determine Plaintiff's "areas of strength and weakness." P-15 1. Dr. Anderer used various cognitive assessments in reaching her conclusions. *See* P-15; P-21 8 of 19. Ultimately, Dr. Anderer produced a report of her findings and provided the report to Parents. P-15.

Around the time Parents retained Dr. Anderer to evaluate Plaintiff, Parents also retained a private speech/language pathologist, Ms. Axelman, to evaluate Plaintiff's speech and language abilities. HOD 7 ¶ 41 (citing P-19 (Ms. Axelman's Speech and Language Summary and Recommendations)). Ms. Axelman also produced a report for Parents. Among other recommendations, Ms. Axelman suggested that Plaintiff "receive two to three intensive, individual, forty-five minute sessions of speech/language therapy per week to address his underlying oral language problems." P-19 7 of 23; HOD 8 ¶ 49. Later, at Ms. Axelman's recommendation, Parents retained the services of speech/language therapist Ms. Jan Wechsler to provide Plaintiff with speech therapy. Hr'g Tr. 310:4–15.

### C. Parents Contact Defendant to Evaluate Plaintiff in Advance of Ninth Grade

In late December 2015 and early January 2016, Parents contacted Defendant to request that Defendant evaluate Plaintiff for special education programming, ostensibly to aide Plaintiff in his education at a Radnor Township School District school. HOD 4 ¶ 10. Unbeknownst to Defendant, on January 7, 2016, before Parents received from, or returned to, Defendant the requisite Permission to Evaluate form that would initiate the evaluation process, Parents submitted entrance applications to three private schools, including Delaware Valley Friends School ("DVFS")—the school where Parents later unilaterally enrolled Plaintiff. HOD 16 ¶ 111. Parents paid DVFS a one hundred dollar application fee and further represented to DVFS that they were "pursuing school district funding" to pay for Plaintiff's private school tuition. HOD 16 ¶ 111. Meanwhile, Plaintiff continued his eighth grade year in parochial school. *See* HOD 9 ¶ 58 (finding that Parents "expressed that [they] wanted Student to finish eighth grade at the Parochial School rather than starting services with the District" in the middle of the 2016 school year).

On February 2, 2016, Parents returned the required Permission to Evaluate form to Defendant with a copy of Dr. Anderer's Confidential Report of Psychoeducational Evaluation and Ms. Axelman's Speech and Language Summary and Recommendations for consideration by the eventual IEP team charged with designing Plaintiff's IEP.  HOD 4 ¶ 11.

Having obtained permission from Parents to evaluate Plaintiff, Defendant embarked on a thorough inquiry into Plaintiff's educational strengths and weaknesses.  HOD 4–6 ¶¶ 15–32. Among other things, Defendant's evaluation of Plaintiff included a Radnor Township School District psychologist: observing Plaintiff in his private parochial school, interviewing two of Plaintiff's teachers, requesting Plaintiff's teachers complete various surveys and evaluations of Plaintiff, assessing Plaintiff's cognitive abilities using, among other things, the Wechsler Intelligence Scale for Children-Fifth Edition (WISC-V),[2] the Informal Reading Inventory assessment developed by Temple University, the Clinical Evaluation of Language Fundamentals-Fourth Edition, the Wechsler Individual Achievement Test-Third Edition (WIAT-III),[3] the Behavior Assessment System for Children-Second Edition (BASC-2),[4] and the Children's Memory Scale).  HOD 4–6 ¶¶ 15–32.

On April 2, 2016, Defendant issued its Evaluation Report of Plaintiff.  *See generally* P-21 (Defendant's Evaluation Report).  Defendant concluded, among other things, that Plaintiff's

---

[2] The WISC-V assessment is administered by a psychologist, completed by the student, and is used to determine the student's cognitive skills in things such as memory, verbal comprehension, reasoning, and processing speed.  *See* P-21 7 of 19 (providing a description of the skills assessed by the WISC-V).

[3] The WIAT-III assessment is administered by a psychologist, completed by the student, and is used to determine various areas of a student's academic achievement.  *See* P-21 8 of 19 (providing a description of the "three major domains" tested using the WIAT-III).

[4] The BASC-2 assessment is completed by a student's parents and teachers and is used to evaluate the student's emotional and behavioral strengths and weaknesses.  *See* P-21 12 of 19 (explaining that the BASC-2 is a "multi-dimensional rating scale that measures numerous aspects of behavior and personality.").

"primary disability IDEA classification is Autism Spectrum Disorder with a secondary classification of Speech-Language Disorder." HOD 6 ¶ 32. In view of Plaintiff's Autism Spectrum disorder and Speech-Language Disorder, Defendant determined that Plaintiff qualified for special education services under the IDEA. P-21 16 of 19 (concluding that "[t]he student has a disability AND is in need of specially designed instruction, and therefore IS ELIGIBLE for special education"); *see also* HOD 2 (providing that "Student is . . . eligible for special education pursuant to the Individuals with Disabilities Education Act . . . under current classifications for autism and speech/language impairment").

### D.    Development of the IEP

Just over two weeks later, on April 18, 2016, Defendant hosted an IEP team meeting with Parents. HOD 9 ¶ 51. Many persons attended the meeting including: Parents, three regular education teachers, two special education teachers, the school district psychologist who assisted in the creation of Defendant's Evaluation Report, Plaintiff's private psychologist, Plaintiff's private speech pathologist, a Local Education Agency representative, Defendant's supervisor of instruction, and an education advocate. S-4 3 of 43 (IEP). Together, these persons formed Plaintiff's IEP team. S-4 3 of 43.

During the meeting, the IEP team reviewed Defendant's Evaluation Report and the draft IEP. H'rg Tr. 33:14–15. Neither Parents nor the special education advocate lodged any objection to the evaluation report or IEP at that time. Hr'g Tr. 34:19–24 (testifying that it was not until ten days after the IEP meeting that Defendant "had heard about concerns. We did not hear any concerns about our evaluation when we were going over it at the meeting."). At the end of the IEP meeting, Defendant explained to Parents that Defendant would next send its proposed

IEP and a Notice of Recommended Educational Placement ("NOREP") to Parents for their approval. HOD 9 ¶ 57.

Ten days after the IEP meeting, on April 28, 2016, Parents sent a letter to Defendant rejecting the proposed IEP and the NOREP. HOD 10 ¶ 60. Parents requested another meeting with Defendant to discuss the proposed IEP. HOD 10 ¶ 62.

On June 15, 2016, the Parties again met with Defendant. HOD 10 ¶ 63. Prominent among the matters discussed at the second IEP meeting was Parents' private speech/language therapist's concern that "the District's proposed amount of speech and language group therapy was insufficient, that pull-out services and push-in services were not going to address the whole continuum of Student's needs, and that a regular education classroom would be too large, too noisy, and too fast-paced for Student." HOD 10 ¶ 64. Parents also voiced a concern that Plaintiff needed a "small, more structured environment so [Plaintiff] would not be overwhelmed and would not be distracted." HOD 10 ¶ 65. Given Parents' private speech/language therapist's and Parent's concerns, Defendant "added four more Specially Designed Instructions (SDIs) to the IEP," each of which was targeted at giving Plaintiff more structure, personal attention, and tools for increasing his focus. HOD 10 ¶ 67; *see* S-4 36 of 43 (memorializing that on "6/15/16" four SDIs were added to the IEP). After the June 15, 2016 follow-up meeting, having considered the additional input from Parents, Defendant finalized and issued the IEP. HOD 11 ¶ 78;

On June 20, 2016, Defendant issued its second NOREP to Parents with a final proposed IEP. HOD 10 ¶ 69. On June 28, 2016, Parents communicated to Defendant that they considered the proposed IEP inappropriate under the IDEA and that they, therefore, would enroll Plaintiff in a private school at public expense. HOD 11 ¶ 70. On June 29, 2016, Parents officially rejected

the second NOREP by letter.  HOD 11 ¶ 71.  On July 15, 2016, Parents officially enrolled

Plaintiff in private school at DVFS.  HOD 11 ¶ 72.  Plaintiff has attended DVFS ever since.

Despite Parents' unilateral decision to enroll Plaintiff in private school, at Parents'

request, Defendant met with Parents again.  On July 18, 2016, Defendant and Parents met, and

this time parents were not only accompanied by a special education advocate, but also by legal

counsel.  HOD 11 ¶ 73.  At the July 18, 2016 meeting, Parents stated their concern about

Plaintiff's placement at Radnor Township High School because of the high school's size.  HOD

11 ¶ 74.  Defendant explained that the IEP addressed such concerns about size through a number

of SDIs, including those that Defendant added to address Parents' concerns after the June 15,

2016 IEP team meeting.  HOD 11 ¶ 74.

The July 18, 2016 meeting was the last time the Parties discussed Plaintiff's IEP and

placement until Plaintiff filed a due process complaint seeking a decision that Plaintiff was

entitled to reimbursement of Plaintiff's private school tuition because Defendant's IEP did not

offer Plaintiff a Free Adequate Public Education ("FAPE") as required by the IDEA.  HOD 11 ¶

74.

E.      The IEP

At forty-two pages long, the final IEP includes, among other things: Plaintiff's "Present

Levels of Academic Achievement and Functional Performance,"[5] "Parental input from meeting

on 4-18-16,"[6] Parental input from the IEP team meeting on "6-15-16,"[7] Defendant's offered

"Transition Services,"[8] accommodations to be provided to Plaintiff in connection with Plaintiff's

_____

[5] S-4 7 of 43.
[6] S-4 15 of 43.
[7] S-4 15 of 43.
[8] S-4 18 of 43.  Transition services included, among others, Plaintiff's:

"Participation in State and Local Assessments,"[9] seven "Measurable Annual Goals,"[10] over thirty "Specially Designed Instructions and Modifications,"[11] and other forms of support offered to Plaintiff[12] in connection with Plaintiff's school placement.[13]

The IEP identified Plaintiff's strengths as:

- Average intellectual functioning;
- Average academic achievement/mastery;
- Well-developed math skills;
- Strong encoding skills;
- Average sight word recognition and phonetic decoding;
- Ability to learn and improve with focused interventions;
- Motivated learner; and
- Desire to please others and meet expectations.

HOD 11 ¶ 76 (citing Hr'g Tr. 561–62); S-4 17 of 43.

The IEP identified the following "academic, developmental, and functional needs related to student's disability:"

- Continue to improve reading comprehension
- Continue to improve written expression
- Continue to improve social skills
- Cognitive and visuomotor processing speed
- Continue to improve math problem solving and fluency skills
- Develop self advocacy skills
- Develop speech and language skills

---

attend[ance] [of] 'Freshman Fundamentals' . . . in which [Plaintiff] would meet other same-grade students and be given an opportunity to see the building . . . given a study skills book and taught over the course of a half-hour how to take notes effectively, how to organize, and how to outline . . . . how to identify resources within the building and within the student's life . . . . [how to strike ] school/life balance . . . and how to become part of the high school community.

HOD 15–16 ¶ 108.
[9] S-4 20 of 43.
[10] S-4 25 of 43–31 of 43.
[11] S-4 33 of 43–37 of 43.
[12] S-4 39 of 43–42 of 43.
[13] S-4 39 of 43–42 of 43.

- • Develop organization skills
- • Work towards decreasing anxiety in new situations

HOD 11 ¶ 77 (citing Hr'g Tr. 561–62); S-4 17 of 43.

Section V of the IEP—"Goals and Objectives"—identified the following seven

"measurable annual goal[s]" for his based on Plaintiff's abilities and needs:

| | Plaintiff's Goals | As Stated in the IEP |
|---|---|---|
| 1 | Reading Comprehension and Expression Goal | "Given a 6th grade reading level passage, [Plaintiff] will be able to read and answer questions (both explicit and implicit) with 80% accuracy on 3 consecutive probes as measured every other week." S-4 25 of 43. |
| 2 | Written Expression Goal | "When given a grade level writing prompt, [Plaintiff] will write complete paragraphs with topic sentence, relative supporting details, conclusion statement, and correct grammar, capitalization, punctuation and spelling scoring proficient on the given rubric used in 2 out of 3 writing prompts as measured monthly." S-4 26 of 43. |
| 3 | Math Problem Solving Goal | "Given classroom instruction, [Plaintiff] will use and apply procedures to simplify algebraic expressions, write, solve, graph and apply equations, inequalities, and analyze sets of data for the existence of a pattern with 80% accuracy on 3 of 4 trials as measured monthly." S-4 27 of 43. |
| 4 | Verbal Comprehension/Expression and Language Goal | "When presented with non-literal expressions (ex. idiom, simile or metaphor) during speech-language therapy sessions, [Plaintiff] will demonstrate comprehension by either orally defining the targets or giving an example with 85% accuracy over 6 consecutive weeks as measured monthly." S-4 28 of 43. |
| 5 | Social Skills and Oral Communication Goal | "In a specific direct instruction skill class during individual meetings, role-play situations or small group discussions on a monthly basis, [Plaintiff] will initiate at least three conversations with the teacher, paraprofessional or other student/s and follow through with three conversation volleys related to the initial interaction improving from a baseline of _____ conversation initiations." S-4 29 of 43. |

| 6 | Self-Advocacy Skills, Organization Skills, and Executive Functioning Goal | "[Plaintiff] will demonstrate appropriate self-advocacy skills as demonstrated by attaining the following objectives: <br><br> 1. With # prompts fading to # prompts/independence, when presented with a demand that [Plaintiff] is having difficulty complying with for any reason (e.g. does not understand, feels overwhelmed, etc) [Plaintiff] will seek out staff to assist him with clarifying the demand and planning for its completion. <br> 2. With # prompts fading to # prompts/independence, whenever [Plaintiff] has past due assignments or make-up work, he will conference with staff to create a manageable schedule for completion. <br> 3. With # prompts fading to # prompts/independence, when [Plaintiff] needs more time, explanation, assistance, etc. to complete an assignment, he will request it." <br><br> S-4 30 of 43. |
| 7 | Social Skills and Anxiety Reduction/Coping Skills Goal | "When faced with a challenging situation (e.g. denied access to preferred activity, non-preferred social situation or conflict, internal conflicts/environmental stressors not expressed outwardly, anxiety) across the school day, academic or social, contrived or authentic setting, [Plaintiff] will identify [] coping strategies previously learned with no more than two prompts (verbal or visual) (ie. take a deep breath, express feelings, ask for assistance or break . . . and independently use the strategy to calm himself in ten minutes or less in 80% of 10 periods/1 semester."  S-4 31 or 43. |

To meet these seven measurable annual goals, the IEP enumerated thirty-one SDIs and

established a "program modification" for Defendant.  Among others, the IEP set forth SDIs to

meet Plaintiff's goals for organization and social skills, and to assist Plaintiff in the classroom setting by reducing distractions. *See* HOD 12–15 ¶¶ 87–103 (providing a summary of the SDIs); S-4 33 of 43–36 of 43.

### F.     Due Process Hearing

Having considered three days' worth of documentary evidence and live witness testimony, the administrative hearing officer concluded that Defendant "ha[d] more than met its obligation under the IDEA to offer [Plaintiff] a free, appropriate education." HOD 27. In reaching this decision, the hearing officer made one notable evidentiary ruling, drew a number of credibility determinations, and addressed three arguments raised by Plaintiff.

First, on the second day of the hearing, Plaintiff attempted to call Dr. Roberta Krauss to testify about a psychological report ("Krauss Report")[14] that Dr. Krauss had authored about Plaintiff. Hr'g Tr. 383:18–384:22. The hearing officer excluded Dr. Krauss's testimony on grounds of relevance and cumulativeness since Dr. Krauss's evaluations of Plaintiff occurred on November 21, 2016, December 15, 2016, and December 21, 2016—after Plaintiff had enrolled in and began attending DVFS—and well after Defendant created the challenged IEP in this case.

As a matter of timing, the hearing officer reasoned that Dr. Krauss, and the Krauss Report, could not "be probative" on the issue of whether Defendant's proposed IEP for Plaintiff was appropriate and met the requirements of a free appropriate public education under the IDEA. Hr'g Tr. 383:24–25. It is a hearing officer's "job" she explained, "to look at the IEP at the time that it was created. And what [Defendant] knew at the time [the IEP] was created." Hr'g Tr.

---

[14] On May 21, 2018, Plaintiff submitted the Krauss Report as a supplemental exhibit to the Sealed Administrative Record. A copy of the Krauss Report, therefore, is docketed at ECF No. 22.

383:24–384:4.  Thus, the hearing officer did not consider the Krauss Report in forming her

conclusion regarding the propriety of the IEP.

Second, the hearing officer found that while she considered "most of [Plaintiff's]

witnesses credible[,]" Plaintiff's "private treating speech/language therapist [Jan Wechsler] was

so wedded to her position that [Plaintiff] could *only* be appropriately served in a setting such as

[DVFS] that her credibility was . . . to be accorded very little weight."  HOD 18–19.  The hearing

officer also observed that Ms. Wechsler's opinion was further weakened by the fact that Ms.

Wechsler had not "observed [Plaintiff] in any classroom setting."  HOD 19 (citing Hr'g Tr. 305–

82).

Finally, in rendering her decision, the hearing officer addressed the three reasons why

Plaintiff believed the IEP failed to offer Plaintiff a FAPE.  In Plaintiff's post-hearing brief,

Plaintiff argued that:

> 1) the IEP does not offer a program that will allow student to make
> appropriate progress in all areas of need known to the District at the
> time it proposed the IEP;
> 2) the IEP proposes a placement for Student that ignores the
> []compelling need for a small, highly-structured, distraction-
> minimized environment with direct and immersive instruction;
> [and]
> 3) the IEP was not clear about how some of its most critical SDI and
> modifications (and most notably the paraprofessional) would be
> implemented for Student.

HOD 24.  The hearing officer considered each of these arguments in turn, and concluded that (1)

"the IEP's goals and SDIs comprehensively address the constellation of Student's complex

needs[,]" (2) "[a]ccepting for the sake of argument that Student does require small highly

structured environments . . . the District's proposed classes offered those advantages at a level far

above IDEA's guaranteed 'basic floor of opportunity[,]'" and (3) the SDI relating to the use of a

paraprofessional was "straightforward" and the IEP provided a "good place to start" educating Plaintiff. HOD 24–26.

Plaintiff argues that each of these three conclusions was erroneous. *See* Pl.'s Mem. of Law in Supp. 22 (stating that the "District's IEP fails to offer [Plaintiff] a FAPE in three ways," and proceeding to articulate the same arguments rejected by the hearing officer). As explained in detail below, the Court rejects, as the hearing officer rejected, each of Plaintiff's arguments and concludes that the IEP not only provided Plaintiff with a "basic floor of opportunity" as required under the IDEA, but that the IEP far exceeded the base requirements of the law.

## III. APPLICABLE STANDARDS OF REVIEW

### A. Modified De Novo Standard of Review

When reviewing a hearing officer's decision "on an IDEA claim, district courts employ a 'modified de novo' standard of review." *J.G. v. New Hope-Solebury Sch. Dist.*, 323 F. Supp. 3d 716, 722 (E.D. Pa. 2018) (citing *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)). Under the "modified de novo" standard of review, the "district court must give 'due weight' to the administrative record and must consider factual findings from the administrative proceedings 'prima facie correct.'" *Jack J. v. Coatesville Area Sch. Dist.*, 2018 WL 3397552, *6 (E.D. Pa. July 12, 2018) (citing *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012)). Thus, "[a] district court reviewing an administrative fact-finder's conclusions must defer to such factual findings unless the court identifies contrary non-testimonial evidence in the record or explains that the record read in its entirety compels a different conclusion." *Braden O. v. W. Chester Area Sch. Dist.*, 2017 WL 2869397, at *4 (E.D. Pa. July 5, 2017) (citing *S.H.*, 336 F.3d at 270). For example, the issue of "whether an IEP is appropriate is a question of fact" and, therefore, the administrative hearing officer's decision on this issue should be afforded

appropriate deference. *S.H.*, 336 F.3d at 270. A court must similarly defer to a hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (emphasis in original).

As for a hearing officer's legal conclusions, such legal conclusions "are subject to plenary review." *Braden O.*, 2017 WL 2869397 at *4 (citing *S.H.*, 336 F.3d at 271).

### B.    Burden of Persuasion

In IDEA cases, the party appealing from an adverse administrative decision "bears the burden of persuasion before the district court as to each claim challenged." *Ridley,* 680 F.3d at 270. In this case, Plaintiff, in appealing the adverse decision of the hearing officer below, carries the burden.

## IV.    DISCUSSION

To determine whether parents are entitled to reimbursement for their unilateral placement of a child in a private school after refusing a public school's offered IEP, courts apply the three-part *Burlington-Carter* test. *See, e.g.*, *Benjamin A. through Michael v. Unionville-Chadds Ford Sch. Dist.*, No. 16-2545, 2017 WL 3482089, at *15 (E.D. Pa. Aug. 14, 2017) (applying the "*Burlington-Carter* test" to private school tuition reimbursement case); *Methacton Sch. Dist. v. D.W.*, No. 16-2582, 2017 WL 4518765, at *5 (E.D. Pa. Oct. 6, 2017) (same). Under the *Burlington-Carter* test, the party seeking relief must show:

(1)    The public school did not provide a FAPE;
(2)    Placement in a private school was proper; and
(3)    The equities weigh in favor of reimbursement.

*Benjamin A.*, 2017 WL 3482089, at *15 (citing *Florence Cty. Sch. Dist. v. Carter ex rel. Carter*, 510 U.S. 7, 12–16 (1993)).

The plaintiff must establish each of the three prongs of the *Burlington-Carter* test to prevail. Thus, failure on any one of the prongs is fatal to a demand for reimbursement. Indeed, if the plaintiff fails to establish the first prong of the test, then the reviewing court may immediately end its analysis. *See, e.g.*, *Benjamin A.*, 2017 WL 3482089, at *17 (stopping analysis after concluding that aggrieved student/parents had not established the first prong of the *Burlington-Carter* test); *N.M. v. Central Bucks Sch. Dist.*, 992 F. Supp. 2d 452, 472 (E.D. Pa. 2014) (same).

To prove the first prong of the test—that the public school did not provide a FAPE—the party seeking relief must show that the public school failed to "offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

**A. Defendant Offered an Appropriate IEP and, Therefore, Provided Plaintiff With a FAPE**

The Court begins its analysis below first by analyzing the IEP and concluding that the IEP was reasonably calculated to enable Plaintiff to progress in light of Plaintiff's circumstances. As such, the IEP provided Plaintiff with a FAPE as required under the IDEA and Plaintiff's claim for private tuition reimbursement fails under the first prong of the *Burlington-Carter* test. Then, the Court concludes its analysis by addressing and rejecting each of Plaintiff's three specific arguments for reversing the hearing officer's decision.

**i. The IEP was appropriate because it was reasonably calculated to enable Plaintiff to progress in light of Plaintiff's circumstances.**

In enacting the IDEA, Congress intended "to ensure that all children with disabilities have available to them a <u>free appropriate public education</u> that emphasizes special education and related services designed to meet their unique needs and prepare them for further education,

employment, and independent living." 18 U.S.C. § 1400(d)(1)(A) (emphasis added). To provide

a "free appropriate public education," schools must ensure that special education and related

services are provided "in conformity with [a child's] individualized education program" or

"IEP." 18 U.S.C. § 1401(9)(D).

The Supreme Court has explained that the central goal of any IEP is "to enable the child

to make progress." *Endrew F.*, 137 S. Ct. at 999. The "progress contemplated by [an] IEP must

be appropriate in light of the child's circumstances." *Id.* "An IEP is not a form document. It is

constructed only after careful consideration of the child's present levels of achievement,

disability, and potential for growth." *Id.* (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(l)–(IV),

(d)(3)(A)(i)–(iv)).

The focus of any inquiry into the adequacy of an IEP is the child and, therefore, the

inquiry is necessarily fact-intensive. That the inquiry is particularly fact-intensive was made

clear by the Supreme Court's decision not "to establish any one test for determining the

adequacy of educational benefits conferred upon all children covered by the Act." *Endrew F.*,

137 S.Ct. at 991. "[T]his fact-intensive exercise will be informed not only by the expertise of

school officials, but also by the input of the child's parents or guardians." *Id.* at 999. Although a

child's parents' input must be considered in the formulation of the child's IEP, a school district

"is not required to provide a specific program or employ a specific methodology requested by the

parent." *Parker C. through Todd v. W. Chester Area Sch. Dist.*, No. CV 16-4836, 2017 WL

2888573, at *7 (E.D. Pa. July 6, 2017); *see also Coleman v. Pottstown Sch. Dist.*, 983 F. Supp.

2d 543, 563 (E.D. Pa. 2013) (citing *P.P. ex rel. Michael P. v. W. Chester Areas Sch. Dist.*, 585

F.3d 727, 729–30 (3d Cir. 2009)) (stating that "maximal or optimal educational services or

results are not guaranteed under the IDEA"). What a school district must do, however, is

"identify goals for meaningful improvement relating to a student's potential." *Coleman*, 983 F. Supp. 2d at 563 (citing *P.P. ex rel. Michael P.*, 585 F.3d at 729–30).

As a matter of practice, a valid IEP will "respond[] to the student's identified educational needs by identifying the student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching those goals." *Coleman*, 983 F. Supp. 2d at 563 (citing *K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.*, 806 F. Supp. 2d 806, 813 (E.D. Pa. 2011)); *see also D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010)) (providing same). The IDEA requires, in short, that an IEP "provide [a] student with a 'basic floor of opportunity.'" *J.G.*, 323 F. Supp. 3d at 724 (emphasis added).

Here, the record reflects that the IEP was reasonably calculated to enable Plaintiff to progress in light of his circumstances. Defendant rightly engaged in a thorough evaluation of Plaintiff's educational needs and abilities while incorporating Parents' and Parents' private experts' input; the IEP set forth seven measurable annual goals for Plaintiff based on his present needs and abilities; and the IEP provided over thirty specially designed instructions and service modifications to aid Plaintiff in reaching Plaintiff's goals.

### a. Defendant performed a comprehensive evaluation of Plaintiff to determine Plaintiff's then-present needs and abilities.

To "assist with educational planning," and at Parents' request, Defendant engaged in an extensive evaluation of Plaintiff's educational and developmental needs and abilities. P-21 1 of 19. As the hearing officer found and—having reviewed the record—this Court agrees, Defendant "in a fair and thorough manner[,] collected its own observational data, its own formal testing data, and data it gleaned from the input of teachers and Parents, and also considered detailed data offered by the private evaluating psychologist and the private evaluating and

treating speech/language therapists." HOD 26. That Defendant's evaluation of Plaintiff was detailed and exhaustive is particularly impressive given "the [Defendant] had not had the opportunity to work with [Plaintiff] in an educational setting since [Plaintiff was in] Kindergarten." HOD 26; *see also* HOD 3 ¶ 7 (citing H'rg Tr. 640) (finding that Plaintiff had been educated at Radnor Elementary School for one year of Kindergarten before Parents removed Plaintiff from public school in favor of private parochial school).

In conducting its evaluation, Defendant drew upon a wide range of sources. Among other things, Defendant dispatched its school district psychologist—Amy Wildey, Ed.M., CSP, to observe Plaintiff in his English Language Arts class at Plaintiff's private parochial school. P-21 4 of 19. As part of Ms. Wildey's observation, she observed Plaintiff's behavior during instruction and interviewed two of Plaintiff's teachers for their input about Plaintiff. P-21 4 of 19 (showing that school district psychologist sought and received input from Mr. McConomy, Plaintiff's language arts teacher); Hr'g Tr. 122:7–10 (testifying that school district psychologist sought and received input from Mr. Heacock, Plaintiff's math, science, and social science teacher); H'rg Tr. 156:20–159:14 (testifying that a district psychologist traveled to Plaintiff's private parochial school to observe Plaintiff in the classroom setting and have a discussion about Plaintiff with Plaintiff's teacher).

Ms. Wildey also implemented several recognized cognitive and learning assessments to determine Plaintiff's academic and developmental circumstances. *See* P-21 7–15 of 19 (showing that Defendant administered assessments to Plaintiff's mother and teacher, including the BASC-II assessment); P-21 13 of 19 (showing that Plaintiff completed an assessment relating to areas of self-reported concern); HOD 4–6 ¶¶ 15–32 (recounting that Ms. Wildey administered the WISC-V, WIAT-III, and Informal Reading Inventory assessments). Ms. Wildey's use of such

assessments is fully consistent with recognized practices in evaluating students. *See, e.g.*, *K.D.*, 2017 WL 3838653, at *8 (citing with approval to a school district's use of various cognitive assessments, like those used by Defendant in this case, and concluding that the school district's evaluation of a student's abilities and needs complied with the requirements of the IDEA).

Defendant also considered and incorporated information from Plaintiff's private psychological and educational experts and from Parents into its Evaluation. *See, e.g.*, P-21 5 of 19 (incorporating Dr. Anderer's Confidential Report of Psychoeducational Evaluation into Defendant's Evaluation); P-21 6 of 19 (incorporating Ms. Axelman's Speech and Language Summary and Recommendations into Defendant's Evaluation); P-21 2–3 of 19 (incorporating a written narrative of Parents' concerns for and observations of Plaintiff into Defendant's Evaluation); P-21 6 of 19 (incorporating Plaintiff's personal medical history and family medical history into Defendant's Evaluation). Consistent with Defendant's incorporation of Plaintiff's private psychological and speech/language evaluations, the IEP itself incorporated information from Plaintiff's private psychological and speech/language reports and from discussions with Parents. *See, e.g.*, S-4 15 of 43 (incorporating "Parental input from meeting on 4-18-16" directly into the IEP).

As the evidence shows, Defendant engaged in a rigorous evaluation of Plaintiff's then-present needs and abilities before designing the IEP.

### b. Using Defendant's Evaluation as a springboard, the IEP Team designed the IEP with seven measurable annual goals tailored to Plaintiff's needs and abilities.

Based on its rigorous evaluation, Defendant properly generated a thorough list of Plaintiff's strengths and "academic, developmental, and functional needs related to [Plaintiff's] disability," on which Defendant relied in setting measurable annual goals for Plaintiff. S-4 17 of

43; *see also* HOD 11 ¶ 77 (citing Hr'g Tr. 561–62) (summarizing Defendant's Evaluation and findings); P-21 15–16 of 19 (providing a narrative summary of Plaintiff's "present levels of academic achievement" and "present levels of functional performance").

The IEP team identified Plaintiff's strengths as: average intellectual functioning; average academic achievement/mastery; well-developed math skills; strong encoding skills; average sight word recognition and phonetic decoding; ability to learn and improve with focused interventions; being a motivated learner; and having a desire to please others and meet expectations.  HOD 11 ¶ 76 (citing Hr'g Tr. 561–62); S-4 17 of 43.  The IEP team then identified Plaintiff as needing to: improve his reading comprehension, his written expression, his social skills, his visuomotor processing speed, his math problem solving and fluency skills; develop his self-advocacy skills, speech and language skills, organization skills; and work to decrease his anxiety.  HOD 11 ¶ 77 (citing Hr'g Tr. 561–62); S-4 17 of 43.

Based on these strengths and needs, the IEP team developed seven measurable annual goals for Plaintiff that were reasonably calculated to allow Plaintiff to improve upon those strengths and address his needs.  That Plaintiff's measurable annual goals were properly linked to Plaintiff's strengths and needs is apparent in the below chart.  The chart shows Plaintiff's measurable annual goals on the left and Plaintiff's identified abilities and needs on the right:

| | Measurable Annual Goal | Identified Ability for Improvement/Need to be Addressed[15] |
|---|---|---|
| 1 | Reading Comprehension and Expression Goal.  S-4 25 of 43. | Defendant's Evaluation identified Plaintiff as having a "reading disability" P-21 15 of 19.  Defendant also noted that Plaintiff's: "[l]anguage-based academic skills . . . continue to fall below expectations," Plaintiff's "[d]eficits are most evident on measures of comprehension and with increasingly complex language," |

---

[15] The citations included in this column are illustrative, not exhaustive.

| | | |
|---|---|---|
| | | Plainitff exhibits "performance below expectations for reading." P-21 15 of 19.<br><br>Similarly, Plaintiff's private parochial school teachers expressed that they "would like to see him to continue to improve his reading comprehension." P-21 6 of 19. |
| 2 | Written Expression Goal. S-4 26 of 43. | Plaintiff's private parochial school teachers expressed to Defendant that they "would like to see [Plaintiff] continue to improve . . . written language skills." P-21 6 of 19.<br><br>Defendant found that Plaintiff had "[p]roblems with higher level verbal expression [which] inevitably extend to the writing process." P-21 5 of 19. |
| 3 | Math Problem Solving Goal. S-4 27 of 43. | Defendant found that Plaintiff had a relative weakness in "math fluency," specifically weaknesses in "math problem solving" and "multiplication fluency." P-21 8 of 19. |
| 4 | Verbal Comprehension/Expression and Language Goal. S-4 28 of 43. | "Speech-language testing demonstrated [that Plaintiff had] both receptive and expressive deficits . . . . [t]he latter is particularly true with increasingly complex linguistic material." P-21 15 of 19.<br><br>Defendant found that Plaintiff "had difficulty verbally combining multiple ideas . . . completing idioms or expressions, and providing explanations." P-21 5 of 19. |
| 5 | Social Skills and Oral Communication Goal. S-4 29 of 43. | Defendant found that Plaintiff had "difficulty with a critical aspect of social pragmatic success; he does not accurately recognize or pick up on the nonverbal clues in his environment which reveal how others feel or their experiences." P-21 11 of 19. |
| 6 | Self-advocacy Skills, Organization Skills, and Executive Functioning Goal. S-4 30 of 43. | Parents expressed, as memorialized in the IEP, that Plaintiff "needs to increase his independence and advocate on his own behalf." S-4 17 of 43. Parents explained that Plaintiff "is so accommodating that he has difficulty being an advocate for himself." S-4 17 of 43. |
| 7 | Social Skills and Anxiety Reduction/Coping Skills Goal. S-4 31 or 43. | Defendant found that Plaintiff "appears concerned about making mistakes and is generally nervous much of the time. Adaptive |

| | | skills were universally reported to be below expectations."  P-21 12 of 19. |
|---|---|---|

As this side-by-side chart shows, Plaintiff's measurable annual goals were reasonably grounded in the abilities and needs that Defendant identified in connection with its evaluation of Plaintiff's educational and developmental circumstances.

       **c.**   **The IEP included thirty-one specially designed instructions and additional modifications to assist Plaintiff in accomplishing his goals.**

Having established measurable annual goals reasonably calculated to enable Plaintiff to progress in view of his circumstances, Defendant properly articulated thirty-one concrete "specially designed instructions" to assist Plaintiff in reaching these seven goals.  Most important of the thirty-one SDIs, for purposes of this case, were those pertaining to Plaintiff's goals for organization skills, social skills, Plaintiff's need for focus and structure, and Plaintiff's needs relating to speech and language.[16]

To achieve Plaintiff's organization skills goal, the IEP included, for example, the following SDIs:

> Participation in a structured study hall.  Class will be scheduled within the student's weekly schedule to assist with organization of assignments.
>       . . .
> [Plaintiff] will have a monthly locker check with an adult to aide in organization.
>       . . . .
> Provide [Plaintiff] with a writing editing checklist and a graphic organizer when he is given a writing assignment or assessment of 2 or more paragraphs.
>       . . . .
> Reinforce self-advocacy skills, encourage [Plaintiff] to ask clarifying questions and raise his hand to repeat directions.

---

[16] *See also* HOD 12–16 ¶¶ 87–103 (summarizing additional SDIs and connecting the SDIs to Plaintiff's measurable annual goals).

To achieve Plaintiff's social skills goal, the IEP included, among others, the following

SDIs:

> Participation in a direct instruction focusing on social skills and communication skills. Number of sessions per week will be determined per schedule.
>
> . . . .
>
> When group work is assigned the teacher should monitor the group to ensure that [Plaintiff] has a defined role and participates appropriately.

S-4 33–35 of 43.

Regarding Plaintiff's weakness in focus and his need for structure and distraction

minimization, the IEP included, among others, the following SDIs:

> Chunking of long term assignments/projects to break down the project into smaller, more manageable parts.
>
> . . .
>
> Meet/conference with [Plaintiff] throughout the completion of a writing assignment to discuss the writing process and to plan ahead.
>
> . . .
>
> Preferential seating near point of instruction to aide in focus and minimize distractions.
>
> . . .
>
> Prompt student to remain on task during independent work in all core area subjects. Prompts can be visual or verbal.
>
> . . .
>
> Small group testing to assist with distraction and focus during assessments.
>
> . . .
>
> When there is a known change in the school schedule, alert [Plaintiff] in advance and provide instruction or verbal reminders on how to prepare for a smooth transition.
>
> . . . .
>
> [Plaintiff] will have access to a safe adult throughout the school day.
>
> . . .

> Case manager will meet with [Plaintiff] at least once a week to
> check in.
>                          . . .
> Access to a paraprofessional in the following core subjects; social
> studies, science, math.
>                          . . .
> [Plaintiff] will participate in small group, direct instruction class
> for Language Arts using research based computer reading software
> in a double block class setting.

S-4 33–36 of 43.

In addition to SDIs, the IEP also provided "related services" to Plaintiff to address

Plaintiff's specific need for speech and language development in the form of a weekly thirty-

minute group speech/language instruction with a certified speech therapist. S-4 36 of 43; HOD

13 ¶ 92.

Under the IEP, Plaintiff's speech therapist would not only provide direct instruction to

Plaintiff, but also "obtain vocabulary that would be used in class so that she could conduct pre-

teaching/re-teaching to address [Plaintiff's] difficulty with complex language and pragmatic

aspects of language." HOD 13 ¶ 94 (citing Hr'g Tr. 217). Additionally, Plaintiff's speech

therapist would "contact [Plaintiff's] teachers and/or case manager to find out if [Plaintiff] was

participating in the class, following the directions, and completing work in order to address these

functional areas with [Plaintiff]." HOD 14 ¶ 95 (citing Hr'g Tr. 230). Plaintiff would also attend

"the Academic Success Center, . . . and the very small group (2 student) Effective

Communications Strategies class." HOD 14 ¶ 96 (citing Hr'g Tr. 229, 239–40). Finally,

notwithstanding the various speech and language services Plaintiff would receive, Plaintiff had

"the option of changing from small group to individual sessions" if required. HOD 13 ¶ 93

(citing Hr'g Tr. 225–28).

The hearing officer concluded, as this Court affirms, that Defendant's proposed SDIs and program modification were tailored to Plaintiff's needs and abilities and crafted to enable Plaintiff to make progress toward accomplishing his measurable annual goals.

In short, the Court affirms the fact-intensive analysis and decision of the hearing officer. Defendant's IEP was reasonably calculated to enable Plaintiff to make progress in light of Plaintiff's circumstances. Defendant's IEP, therefore, offered Plaintiff a FAPE. As Defendant offered Plaintiff a FAPE, Plaintiff has failed the first prong of the *Burlington-Carter* test. As Plaintiff has failed the first prong of the *Burlington-Carter* test, Plaintiff is not entitled to public reimbursement for Parents' unilateral decision to enroll Plaintiff in private school.

**B.      Plaintiff's Arguments That The IEP Failed To Offer Plaintiff A FAPE Are Unavailing**

Notwithstanding the Court's conclusion that the IEP offered Plaintiff a FAPE, the Court also will address each of Plaintiff's specific arguments in turn.

Plaintiff contends that the District's IEP failed to provide Plaintiff with a FAPE in three ways. First, "the IEP does not offer a program that will allow C.F. to make appropriate progress in all [of Plaintiff's] areas of need." Pl.'s Mem. Supp. Mot. Summ. J. 22, ECF No. 19. Second, the IEP "proposes a placement for [Plaintiff] that [] ignores [Plaintiff's] compelling need for a small, highly-structured, distraction-minimized environment with direct and immersive instruction." *Id.* Third, "the IEP was not clear even to the District's own personnel—let alone Parents—about how some of its most critical Specially Designed Instruction ("SDI") and modifications (most notably the paraprofessional) would be implemented." *Id.*

1. **That Plaintiff's IEP may have lacked a discrete measurable goal for each of Plaintiff's needs is not dispositive on the issue of whether the IEP was reasonably calculated to enable Plaintiff to make appropriate progress.**

Plaintiff complains that the IEP would not have allowed Plaintiff to progress because it failed to provide goals and specially designed instructions for each of Plaintiff's known educational needs. In support of this assertion, Plaintiff points to the IEP's failure to provide a discrete "goal for [Plaintiff]'s deficits in recognizing facial expressions, body language, and other non-verbal cues, or for interpreting tone of voice," and the IEP's failure to include a discrete "goal to build the root skill of organizing and structuring [Plaintiff's] work." Pl.'s Mem. Supp. Mot. Summ. J. 22, ECF No. 19. Plaintiff presented this same argument to the hearing officer in Plaintiff's post-hearing briefs and the hearing officer concluded that although the Third Circuit does not require that an IEP identify a specific goal for each of a child's needs, in this case, the IEP's "goals and SDIs comprehensively address[ed] the constellation of [Plaintiff's] needs." HOD 24. The Court agrees.

First, a school district "does not need to provide 'distinct measurable goals for each recognized need of a disabled student to provide a FAPE.'" *L.M. ex rel. M.M. v. Downingtown Area Sch. Dist.*, No. 12-CV-5547, 2015 WL 1725091, at *16 (E.D. Pa. Apr. 15, 2015) (citing *Coleman*, 983 F. Supp. 2d at 572–73); *see also Coleman v. Pottstown Sch. Dist.*, 581 F. App'x 141, 147 (not precedential) (3d Cir. 2014) (concluding that while a challenged IEP "provided only three goals—one each for reading, writing, and math" and another IEP "contained only a reading goal and an incomplete math goal" that it was not improper to find that the School District was not required to create 'distinct measurable goals for each recognized need of a disabled student to provide a FAPE.'"). Indeed, courts have frequently observed that an IEP's failure to provide a discrete measurable goal for each recognized need of a student is not

dispositive on the issue of whether an IEP is reasonably calculated to allow the student to make progress in light of the student's circumstances. *See, e.g.*, *Benjamin A.*, 2017 WL 3482089, at *12 (collecting cases in which courts have concluded that failure to include particular measurable goals in an IEP did not affect students' rights to FAPE).

That an IEP need not articulate specific goals or SDIs to provide a FAPE conforms with the Supreme Court's guidance that a district court's "review of an IEP must appreciate that the question is whether the IEP is <u>reasonable</u>, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999 (citing *Rowley*, 458 U.S. at 206–07); *see also Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (citing *Rowley*, 458 U.S. at 205–06) (cautioning that district courts should not "substitute their own notions of sound education policy for those of the educational agencies they review"); *S.C. through Helen C. v. Oxford Area Sch. Dist.*, No. 17-2990, 2018 WL 5778222, at *3 (3d Cir. Nov. 2, 2018) (not precedential) (explaining that the IDEA requires that a public school district provide a child with a reasonable, but not perfect educational program).

Second, as set forth in detail above, contrary to Plaintiff's argument, the IEP included measurable annual goals logically and reasonable linked to Plaintiff's abilities and needs relating to social skills and communication, and organization.[17] While Plaintiff contends that the IEP lacked a "goal for C.F.'s deficits in recognizing facial expressions, body language, and other non-verbal cues, or for interpreting tone of voice," and a "goal to build the root skill of organizing and structuring [Plaintiff's] work," these goals were sufficiently captured by the seven measurable annual goals articulated in the IEP.[18]

---

[17] *See* above Section IV.A.i.b for an analysis of Plaintiff's identified abilities and needs and their relation to Plaintiff's measurable annual goals.
[18] *Id.*

An IEP's goals need not be articulated in any specific way to be valid. In many cases, for example, courts have rejected claims that failure by an IEP to articulate specific goals—where more general goals sufficiently capture the student needs to be addressed—will invalidate an IEP. *See, e.g.*, *Jack J.*, 2018 WL 3397552 at *29–30 (rejecting a parent's argument that an IEP was inadequate because it lacked provisions for "study skills, organizational skills, and executive functioning skills" where the IEP included goal for "organizational strategies" and SDIs such as "daily checks with special education teacher" and "use of multi-step directions"); *Parker C.*, 2017 WL 2888573, at *9 (rejecting parents' argument that an IEP was inadequate because it did not include goals for "executive functioning" where the IEP otherwise articulated a goal of "task initiation and completion"). Thus, the Court concludes that although the IEP may not have articulated Plaintiff's measurable annual goals in terms of improving upon "deficits in recognizing facial expressions, body language, and other non-verbal cues, or for interpreting tone of voice," or " the root skill of organizing and structuring [Plaintiff's] work," as Plaintiff might articulate them, the seven measurable annual goals in the IEP were, nevertheless, reasonably calculated to address those and others of Plaintiff's needs.[19]

### 2. Defendant's SDIs adequately provided for Plaintiff's needs and abilities relating to organization, focus, structure, and distraction minimization.

Plaintiff next argues that the hearing officer erred in concluding that Defendant's placement of Plaintiff in a regular education environment for seventy-five percent of the day was appropriate given Plaintiff's circumstances. In support of this argument, Plaintiff points to two purported failings by the hearing officer. First, Plaintiff contends that the hearing officer

---

[19] *See* above Section IV.A.i.a–c for a discussion of the design of Plaintiff's IEP, including the construction of Plaintiff's measurable annual goals.

erroneously discounted the testimony of Plaintiff's private speech/language therapist's, Ms. Wechsler. This error was exacerbated, Plaintiff continues, by the hearing officer's decision to exclude the Krauss Report. Second, Plaintiff contends that the hearing officer erred in relying, almost exclusively, on Plaintiff's time in private parochial school to conclude that Plaintiff did not need a small, distraction-minimized, structured environment. Both points are unpersuasive.

First, given the applicable standard of review—modified *de novo* review—the Court is bound by the hearing officer's live witness credibility determinations, including that Plaintiff's expert witness, Ms. Wechsler, was relatively less credible than other witnesses. It is well-established that a court must defer to a hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would <u>justify</u> a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199 (emphasis in original). In this case, the Court concludes that Plaintiff has not adduced sufficient non-testimonial extrinsic evidence to justify setting aside the hearing officer's credibility determination of Ms. Wechsler. Even if the Court were not bound by the standard of review, the Court finds the hearing officer's credibility determination was properly supported by the record. Not only was the hearing officer the most appropriate finder of fact on the issue of credibility in light of her opportunity to observe Ms. Wechsler's demeanor and testimony directly, but the hearing officer also explained that Ms. Wechsler's testimony was less credible on other grounds. Among other reasons, the hearing officer explained that while Ms. Wechsler had worked with Plaintiff one-on-one, she had never "observed [Plaintiff] in any classroom setting." HOD 19. Ms. Wechsler's opinion that a seventy-five percent regular education environment was inappropriate for Plaintiff was, therefore, less credible than other witnesses who had observed Plaintiff in the classroom and opined that Plaintiff's placement was appropriate.

As the hearing officer's credibility determination of Ms. Wechsler was not erroneous, then the hearing officer's decision to exclude the Krauss Report did not, as Plaintiff argues, "compound[]" such error. Pl.'s Mem. Supp. 26 n.5, ECF No. 19. The exclusion of the Krauss Report was, in any event, wholly appropriate.

The "evaluation[] of the adequacy of an IEP can only be determined 'as of the time it was offered to the student, and not at some later date." *Coleman*, 983 F. Supp. 2d 543, 564 (E.D. Pa. 2013); *see also H.D. ex rel. A.S. v. Cent. Bucks Sch. Dist.*, 902 F. Supp. 2d 614, 624 (E.D. Pa. 2012) (quoting *Bayonne Bd. of Educ.*, 602 F.3d at 564–65) (providing that "a court should determine the appropriateness of an IEP as of the time it was made," it may consider evidence acquired after the creation of an IEP, but "only to evaluate the reasonableness of the school district's decisions at the time that they were made"); *Jack J.*, 2018 WL 3397552, at *13 (citing *Endrew F.*, 137 S. Ct. at 999) (same). Since the Krauss Report was created after the IEP had been finalized, the Krauss Report could not have been relevant to the issue of whether the IEP was appropriate. This was precisely the reason that the hearing officer excluded the Krauss Report. Hr'g Tr. 383:24–384:4. Therefore, the exclusion of the Krauss Report was also not erroneous.

Second, Plaintiff's complaint that the hearing officer erroneously relied on Plaintiff's educational history in parochial school as evidence of Plaintiff's ability to perform in a seventy-five percent regular education environment is rejected. While Plaintiff correctly notes that the hearing officer did, in fact, rely on Plaintiff's parochial school experience to support the conclusion that his placement was appropriate, Plaintiff incorrectly implies that this was the only information considered by the hearing officer in reaching this conclusion. Instead, the hearing officer reasoned that even "[a]ccepting for the sake of argument that [Plaintiff] does require

small highly structured environments, I find that the District's proposed classes offered those advantages at a level far above IDEA's guaranteed 'basic floor of opportunity.'" HOD 25. The hearing officer continued:

> [Plaintiff's] projected schedule for the 2016-2017 year provided a double block of Reading/Writing in a special education class with 6 students and a certified special education teacher; Effective Communication Strategies in a special education class with 2 students and a certified special education teacher; Essentials of Algebra in a regular education class with 12 students, a teacher certified in regular and special education and a paraprofessional aid; Algebra I CP in a regular education class with 16 students, a teacher certified in regular and special education and a paraprofessional aide; Biology in a regular education class with 17 students, a regular education teacher and a paraprofessional aide; Academic Success Center (structured study hall), in a regular education class with 13 students and a special education teacher . . . .

HOD 25 (emphasis added). These facts support the hearing officer's decision that Plaintiff's placement was appropriate even if the hearing officer had not considered Plaintiff's educational history in parochial school.

Although Plaintiff may be enjoying the experience of private schooling and may be performing exceedingly well under the private school program, this fact does not mean that the placement offered by Defendant was inappropriate. It is well-recognized that a public school district "is not required to provide the best possible education to maximize educational benefits." *J.E. v. Boyertown Area Sch. Dist.*, 834 F. Supp. 2d 240, 253 (E.D. Pa. 2011) *aff'd sub nom. J.E. ex rel. J.E. v. Boyertown Area Sch. Dist.*, 452 F. App'x 172 (3d Cir. 2011). Thus, even if a private school placement may be "a superior placement" for a child, "this does not mean that the IEP offering [to the child] is not sufficient nor inappropriate." *Id.* In this case, the record shows that Defendant's IEP and the services offered to Plaintiff not only met but exceeded the

minimum requirements of the IDEA; that Plaintiff has benefited from a private education is irrelevant.

### 3. The IEP was sufficiently clear about the implementation of Plaintiff's SDIs, especially in light of the reality that Plaintiff had not attended a public school since his Kindergarten year.

Third, and finally, the Court rejects Plaintiff's argument that "the IEP was not clear even to the District's own personnel—let alone Parents—about how some of its most critical [SDI's] and modifications (most notably the paraprofessional) would be implemented for [Plaintiff]." *Id.* Despite Parents' contention that the SDIs were unclear, especially the SDIs relating to Plaintiff's access to and relationship with trained paraprofessionals, the hearing officer found "given the testimonial evidence" that the role of the paraprofessional, as conceived . . . [is] straightforward." HOD 26. The hearing officer continued explaining that based on testimony presented in the hearing, the paraprofessional "would be present in classes with more than ten students. This person would be available to assist [Plaintiff] as well as other students depending on the class. This person would not 'be on' [Plaintiff], given that [Defendant] aims for its students to be as independent as possible." HOD 26.

That Plaintiff's future interactions with a trained paraprofessional were not outlined for Plaintiff's teachers and staff in a rote step-by-step guide is not only fully consistent with the purpose of the IDEA,[20] but also was not surprising given Plaintiff had not been educated in

---

[20] By its own terms, the IDEA sought to focus educators on the task of providing a "free appropriate education . . . designed to meet [each child's] <u>unique</u> needs." 20 U.S.C. § 1400(d)(1)(A) (emphasis added). Were the Court to insist that the IEP include an inflexible standard procedure for paraprofessionals interacting and educating Plaintiff, the Court would impinge on the role of the IEP team, which should "retain[] flexibility to devise an appropriate program" for each child according to each child's individual circumstances. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 276 (3d Cir. 2012). Such a Court-imposed requirement would further violate the Supreme Court's warning that courts not "substitute their own notions of sound

public school since Kindergarten and had not received any comprehensive special education support in his eight years in parochial school.  HOD 3 ¶¶ 7–9 (finding Plaintiff did not receive special education services from the Delaware County Intermediate Unit—a public institution charged with assisting students eligible for such services—nor did Plaintiff receive accommodations from his parochial school in this regard).  The Court is unpersuaded by Plaintiff's argument that the IEP's SDIs were so vague as to render the IEP inadequate.  On the contrary, the SDIs provided sound guidance for Plaintiff to reach Plaintiff's measurable annual goals.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Judgment on the Administrative Record (ECF No. 19) is DENIED and Defendants' Motion for Judgment on the Administrative Record (ECF No. 15) is GRANTED.  An appropriate Order follows.

---

education policy for those of the educational agencies they review." *Susan N.*, 70 F.3d 751, 757 (3d Cir. 1995) (citing *Rowley*, 458 U.S. at 205–06).